IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

JONATHAN CHRISTOPHER WARD                                          PLAINTIFF

v.                              Civil No. 4:22-cv-04119-SOH-CDC

SHERIFF JACKIE RUNION;
WARDEN JEFFIE WALKER;
CAPTIAN GOLDEN ADAMS; and
AL LANDRETH                                                       DEFENDANTS

## MAGISTRATE'S REPORT AND RECOMMENDATION

This is a civil rights action filed *pro* se by Plaintiff, Jonathan Christopher Ward, pursuant to 42 U.S.C. § 1983.  Plaintiff names Sheriff Jackie Runion, Warden Jeffie Walker, Captain Golden Adams, and Jail Administrator Al Landreth as Defendants and claims each of them violated his constitutional rights in both their individual and official capacities.   Before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 18).  Plaintiff has responded and the Motion is ripe for consideration.  (ECF Nos. 27, 27).  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, Chief United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

### I.  PROCEDURAL BACKGROUND

Plaintiff filed his Complaint on December 9, 2022.  (ECF No. 1).  Defendants Runion, Walker, and Adams answered on January 26, 2023, (ECF No. 9), and Defendant Landreth answered on March 15, 2023.  (ECF No. 13).

In his Complaint, Plaintiff alleges Defendants violated his First, Second, and Fourteenth

1

Amendment rights to freedom of speech, freedom of press, and conditions of confinement.  (ECF

No. 1, p. 4).  Plaintiff specifically alleges:

> On or around 7/07/21, I was told by Miller County Detention Center that my Texarkana Gazette Newspaper subscription was denied/cancelled because MCDC doesn't allow inmates to receive newspapers.  Upon further investigation I discovered MCDC has a policy that forbids inmates from receiving newspapers or publications.  This policy violates the U.S. Constitution.
>
> When I inquired about who was responsible for creating and enacting this policy, I was told by MCDC staff that it was either Sheriff Jackie Runion, Warden Jeffie Walker, or Captain Golden Adams.  I could never get a response from any of these officials.  My grievances and requests were answered by Officer Admin G (John Doe) and were marked as "not a grievance" and were never investigated which prevented any relief.

*Id.* at 4-5 (errors in original).  Plaintiff further explains:

> Miller County Detention Center has a policy enacted by its officials (Defendants listed) which bans its inmate population from receiving newspapers or publications.  This policy is enforced without any penological or just explanation, this policy, plain and simple, is unconstitutional.

(ECF No. 1, p. 5).  Plaintiff asserts both official and individual capacity claims against Defendants.

*Id.*

On August 24, 2023, Defendants filed their Motion for Summary Judgment (ECF No. 18),

Brief in Support (ECF No. 19), and Statement of Indisputable Facts (ECF No. 20).  Defendants

argue they are entitled to summary judgment as a matter of law because there are no genuine

disputes of fact and: (1) Plaintiff's First Amendment right to receive information and ideas was

not violated; (2) the MCDC's ban on newspapers is reasonably related to legitimate penological

interest and not an exaggerated response to those interest; (3) Defendants were not personally

involved in any alleged violation of Plaintiff's rights; (4) Defendants are entitled to qualified

immunity; (5) Plaintiff suffered no physical injury; and (6) there is no basis for official capacity

liability.  (ECF No. 18, p. 2).

Plaintiff filed a verified Response and Brief in Support on November 16, 2023. (ECF Nos. 26, 27). Plaintiff argues the Motion should be denied as (1) Defendants' actions violated his constitutional rights; and (2) there are disputes of material facts. (ECF No. 26). Plaintiff provides legal arguments in support of his position but does not offer any disputes of fact in his Response. (ECF No. 27).

## II.  FACTUAL BACKROUND

Plaintiff is currently incarcerated in the Arkansas Department of Corrections-Ouachita River Unit. However, at all times relevant to this matter, Plaintiff was a pretrial detainee in the Miller County Detention Center ("MCDC") in Texarkana, Arkansas. (ECF No. 1, p. 2). Additionally, at all times relevant to the instant lawsuit, Defendant Runion was the Sheriff of Miller County, Defendant Walker was the Warden of the MCDC, Defendant Adams was the Captain of the MCDC, and Defendant Landreth[1] was the Jail Administrator and Grievance Officer at the MCDC. *Id.*

The facts in this matter are largely undisputed.[2] Plaintiff was booked into the MCDC on July 9, 2021 on charges of possession of drug paraphernalia, possession of a controlled substance, fleeing, and possession of a firearm. (ECF No. 20-2). Thereafter, as Plaintiff alleges in his Complaint, he was denied delivery of his subscription to the Texarkana Gazette, a local newspaper, per the MCDC policy banning newspapers inside the MCDC. (ECF No. 1, pp. 4-5).

---

[1]  Plaintiff originally named "Officer Admin G (John Doe)" as the fourth Defendant in his Complaint. (ECF No. 1, p. 3). Defendants identified Al Landreth in their Answer on March 15, 2023. (ECF No. 13).

[2] Plaintiff did not dispute, in his Response, any factual contentions made by Defendants in their Indisputable Statement of Facts. However, as explained herein, there are some facts in contention as evidenced through the exhibits on the summary judgment record.

On November 7, 2022, Plaintiff submitted a grievance stating: "My family ordered me a newspaper subscription, but I was unable to receive it.  They had to cancel it.  MCDC has an unconstitutional policy that bans inmates from receiving newspaper and publications."  (ECF No. 20-3, p. 1).  On November 7, 2022, Defendant Landreth responded: "You are able to receive news and information via the television provided in your unit."  *Id.*

Also on November 7, 2022, Plaintiff submitted a second grievance stating:

> This is an appeal to my last grievance, I cannot control the tv and haven't been able to watch the news.  I have a right to read newspapers and have freedom of press.  Also those companies have the right to have access to send their material to inmates.  MCDC policy is a direct violation to freedom of speech.  See Human Rights Defense Center vs. numerous county jails around the country.  They have won those cases for the same newspaper ban that [MCDC] has.

(ECF No. 20-3, p. 2).  On November 8, 2022, Defendant Landreth replied: "I have responded to these issues in previous correspondence with you."  *Id*.

Defendants did not cancel Plaintiff's newspaper subscription.  Instead, the policy is that any newspapers delivered to a MCDC detainee is placed in that detainee's property.  (ECF No. 20-7, p. 4).

Defendant Landreth, MCDC Jail Administrator, submitted an affidavit with the MCDC mail policy and procedures at Inmate Mail SOP 10.08.  (ECF No. 20-1).  This policy states in pertinent part:

> It is the policy of the [MCDC] to provide inmate mail privileges.  Inmates shall be encouraged to maintain legitimate correspondence with family and other persons immediately concerned with the inmate's welfare.
> . . .
> Inmates are allowed to access publications under the following guidelines:
>
> 1) Only publications sent directly from a legitimate (recognized) publisher or vendor (such as a retail book seller) will be considered for approval by the Jail Director or designee.  This includes Bibles.
> 2) When a publication has been disapproved, the publications will be logged into the

inmate's property inventory.  A property receipt will be generated and signed by the inmate receiving the publication.  A copy of the signed property receipt will be given to the inmate, and one placed in the inmate's case management folder.

    a)  Inspection of incoming publications shall be:

        (1) For content and contraband.

        (2) All packing and original wrapping will be discarded.

3) The Captain will disapprove a publication if it is deemed an immediate and/or tangible threat to the security or good order of the jail or staff.  This includes but is not limited to content of publications used to introduce contraband.

4) Inmates shall not be permitted to have more than ten (10) books in their possession at any given time.  This provision excludes religious materials and legal or school related books.  Excess materials may be mailed out to a party of the inmate's choosing at the inmate's expense, or they may be donated to the Texarkana Public Library.  **All publications received but disapproved will not be placed in the inmate's property. Upon notification of disapproved items, inmates will have thirty (30) days in which to notify a shift supervisor of the desired disposition of the materials, as previously described.  If the shift supervisor is not contacted within thirty (30) days of inmate notification, the materials will be disposed of at the facility's discretion.**

5) Publications will be disapproved if the material:

    a)  Is typical of a security threat, group/gang (i.e. drawings, signs, symbols, codes, literature, documents, etc.)

    b)  Contains instructions for the manufacturing of explosives, weapons, drugs, drug paraphernalia, alcoholic beverages, escapes paraphernalia, to affect and/or facilitate an escape, or locksmith techniques.

    c)  Advocates violence, racial hatred, or hatred toward any individual, organization, sexual orientation, religion,

    d)  Or nation in such a way as to create a danger of violence in the jail, or by its nature or content, poses a threat to the security, good order, or discipline of the jail, its employees and/or facilitates criminal activity.

    e)  Is of a type that has obviously caused violence or other serious disruption of jail security or good order within the jail or similar facilities.

    f)  Is pornographic; or

    g)  Are newspapers.

6) Inmates are not authorized to order publications the publisher will bill the inmate for later (COD) or receive publications on a trial basis.  All publications shall be prepaid prior to delivery from the publisher.  There are no restrictions on who is allowed to order and prepay for publications for an inmate, except when it is determined these items constitute a threat to the safety, security, or good order of the facility.

7) **All publications shall be paperback binding only, without staples, no exceptions.** Simply removing the cover from the book will not make it acceptable.

8) Review of all publications will be done on an individualized basis.  When a publication has been disapproved, the mail clerk will advise the inmate in writing[.]

(ECF No. 20-6) (emphasis in original).

Defendant Walker, as MCDC's Warden, administers various operations of the detention center and supervises the detention staff.  In his affidavit, Defendant Walker explained the MCDC policy that bans newspapers.  (ECF No. 20-7).  During the time Plaintiff was incarcerated, the MCDC had in place a policy to ban non-religious newspapers.  Subscriptions to newspapers for inmates were not cancelled by MCDC staff when received, but any newspapers delivered to the MCDC were placed in the inmate's property.  *Id*. at 4.

Defendant Walker testified in his affidavit that newspapers were often used to cover lights inside the MCDC.  This misuse poses a significant safety and security concern by diminishing the visibility within cells and obstructs the ability of jail staff to conduct necessary visual checks of detainees.  Visual checks are crucial to detect inappropriate activities, self-harm attempts, health emergencies, or signs of violence within the cells.  *Id.* at 1.  Defendant Walker averred that newspapers were often used to jam door locks in the MCDC, posing a considerable safety and security risk by impeding necessary access to cells by jail staff and creating a hostile environment that undermines security protocols for both staff and inmates.  Walker says access is vital for routine checks and emergency situations, and a jammed lock prevents the swift extraction of an inmate should an urgent evacuation be required.  *Id*. at 2.   Newspapers have also been used to clog toilets in the MCDC.  Walker describes that this creates a security risk through flooding which requires lockdowns of the flooded areas.  The clean-up of these floods also takes deputies away from their essential functions and impacts the regular operations of the MCDC such as feeding, visitation, communications, and sick calls.  Additionally, the water must be turned off to clear out the clog which limits access to water and toilets for the detainees.  *Id*.  Due to all these concerns, Defendants Runion and Walker together determined to enact a policy to ban non-religious newspapers within the MCDC.  The purpose of the policy was to significantly reduce the problems

with covering the lights, jamming the locks, and clogging the toilets.  *Id.*

Defendant Walker explained in his affidavit that newspapers are uniquely problematic due to: (1) the ability to adhere newspapers to surfaces, including cell ceilings, when moistened; (2) because of the size of newspapers when spread out; and (3) the unique disposable nature of newspapers.  The problem with covering lights on the wall or ceiling is not observed with the same frequency with other reading materials such as books, magazines, or other paper.  Furthermore, the detainees tend to treat the newspapers – more than other publications and reading materials – as trash once read.  In other words, detainees tend to treat books and magazines with more care by not using them to clog toilets and jam cell doors with the same frequency as they do with newspapers.  Additionally, according to Defendant Walker, detainees are allowed to store their books and magazines in their property once read which Walker says incentivizes reduction in turning these materials into trash to jam locks or clog toilets.  Defendant Walker explains such a policy would not have the same effect onnewspapers because of the temporary nature of newspapers' information.  *Id*. at 2-3.  After newspapers were identified as the primary cause of covered lights, clogged toilets, and jammed locks and the instant policy was instituted, the MCDC experienced a "significant reduction" with the stated hazards.  *Id.*  at 3..

Finally, Defendant Walker states in his affidavit, to offer alternative access to news and information, the MCDC maintains a contract with Dish Network to provide access to local and national news for the detainee population.  The detainees collectively decide which channel to watch, ensuring no one single channel is forced upon them.  *Id*. at 3-4.  Detainees are also able to receive other information from books, magazines, post cards, letters, phone calls, and visitations.  *Id.*

### III.  LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607.  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. at 610. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Under § 1983, a defendant may be sued in either his personal capacity, or in his official capacity, or claims may be stated against a defendant in both his personal and his official capacities.  The type of conduct that is actionable and the type of defense available depend on whether the claim is asserted against a defendant in his official or individual capacity. *See Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (internal citations omitted).  "Claims against individuals in their official capacities are equivalent to claims against the entity for which they

work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself." *Id.* Personal capacity claims "are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense" to these individual capacity claims. *Id.* To state a claim under 42 U.S.C. § 1983, Plaintiff must allege that the defendant acted under color of state law, and that the actor violated a right, privilege, or immunity secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).

## IV. DISCUSSION

As an initial matter, the Court notes, while Plaintiff listed the First, Second, and Fourteenth Amendments and the phrase "conditions of confinement" in his Complaint, he did not allege any facts to assert any claim other than violations of the First Amendment arising from MCDC's ban on newspapers. Accordingly, the Court interprets Plaintiff's Complaint to allege only First Amendment violations against Defendants.

### A.  MCDC's policy

Defendants argue Plaintiff's First Amendment rights were not violated by the MCDC's policy banning newspapers. Defendants neither dispute the MCDC's complete ban on newspapers (which denied Plaintiff delivery of his Texarkana Gazette subscription), nor Plaintiff's constitutionally protected First Amendment right to receive information and ideas. *See Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972); *see also Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir. 1987) (holding prison inmates retained the First Amendment right to receive and read newspapers outside restrictions based on legitimate penological goals). Defendants argue that the MCDC's policy banning newspapers is constitutionally permissible because it is reasonably

related to legitimate penological interests and is not an exaggerated response to such interests under the governing standard of *Turner v. Safley*, 482 U.S. 78 (1987).

It is well established that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (quoting *Turner,* 482 U.S. at 84). "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Among other things, as Defendants recognized, the "Constitution protects the rights [of inmates] to receive information and ideas." *Kleindienst*, 408 U.S. at 762.

More specifically, "[t]he Supreme Court has made it clear that persons who are incarcerated do not forfeit First Amendment protection of their rights to freedom of speech and religion at the prison gate." *Human Rights Defense Ctr. v. Baxter Cnty. Ark.*, 999 F.3d 1160, 1164 (8th Cir. 2021) (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)). However, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* (quoting *Bell*, 441 U.S. at 547). Prison policies impinging on detainees' First Amendment rights are valid only if they are reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89-90; *Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir. 1999). "[E]ven though this court engages in a deferential review of the administrative decisions of prison authorities, the traditional deference does not mean that courts have abdicated their duty to protect those constitutional rights that a prisoner retains." *Fortner v. Thomas*, 983 F.2d 1024, 1029 (11th Cir. 1993).

"To determine whether a jail or prison policy infringes on the Frist Amendment rights of inmates, as well as those seeking to communicate with them, the relevant inquiry is whether the policy is reasonably related to legitimate penological interests." *Human Rights Defense Ctr.,* 999 F.3d at 1164 (quoting *Thornburgh,* 490 U.S. at 409 (internal quotations omitted)).  In answering this question, courts apply the so-called four factor *Turner* test:

> (1)　　whether a "valid rational connection" exists "between the prison regulation and the legitimate governmental interest put forward to justify it;"
>
> (2)　　"whether there are alternative means of exercising the right that remain open;"
>
> (3)　　"the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and
>
> (4)　　whether there are "ready alternatives" to the policy.

*Turner,* 482 U.S. at 90-91.  Thus, the Court's next step is application of the *Turner* test to the MCDC's newspaper ban.

### 1.　Does a valid rational connection exist?

The Court must first determine if there is a valid rational connection between the MCDC's complete ban of newspapers and the legitimate governmental interest put forward by Defendants to justify it.  This is a threshold requirement, and once it is satisfied, the Court then must weigh the remaining three *Turner* factors to evaluate the constitutionality of the MCDC ban.  *See Sisney v. Kaemingk,* 15 F.4th 1181, 1190 (8th Cir. 2021).

Defendants assert the ban is legitimate and not exaggerated because it is rationally related to the MCDC objective to reduce inmates' use of newspapers to cover lights, jam doors locks, and clog toilets.  Defendants argue each of these problems causes safety and security hazards, sanitation problems, and interrupted efficiency.  Specifically, Defendants put forth evidence

indicating lights covered by newspapers impede visual checks of detainees which prevent the detection of inappropriate activities, self-harm attempts, health emergencies, and signs of violence within the cells.  (ECF No. 20-7).  The summary judgment record also evidences that jamming locks on doors cause safety and security concerns such as preventing deputies from intervening in emergency situations.  *Id*.  Next, the record indicates clogged toilets cause security risks and efficiency problems because once a cell or pod is flooded the detainees must be locked down and deputies diverted from their essential functions to remedy flooding.  *Id*.  Finally, the evidence illustrates that these hazards (covered lights, jammed locks, and clogged toilets) were primarily caused in the past by newspapers but were "significantly reduced" through the institution of the newspaper ban.  *Id*.  Plaintiff did not dispute any of these facts offered by Defendants.

The parties do not dispute, and the Court agrees, that the MCDC possesses a legitimate penological interest in preventing security and safety issues through reduction of the described conditions such as covered cell lights, jammed door locks, and clogged toilets.  The issue then becomes whether Defendants' institution of a complete ban on newspapers is rationally related to preventing these hazards, and not an exaggerated response to them.  *See Sisney*, 15 F.4th at 1190.

This district previously has addressed similar bans aimed at remedying similar hazards in other county detention centers.  *See e.g. Emery v. Helder*, Civil No. 5:16-cv-05193-TLB, 2018 WL 715463 (W.D. Ark. Feb. 5, 2018); *Jones v. Allen,* Civil No. 06-cv-02051-RTD, 2007 WL 2725218 (W.D. Ark. Sept. 18, 2007).[3]

---

[3] The Court notes Defendants reference recent cases from this District specifically addressing the issue of the MCDC's complete ban on newspapers in *Morris v. King*, Civil No. 4:20-cv-04101-SOH, ECF No. 230, 2022 WL 9833542 (W.D. Ark. July 29, 2022) (awaiting trial after the Honorable Barry A. Bryant recommended, and the Honorable Susan O. Hickey adopted, a denial of summary judgment on the plaintiff's First Amendment claim because issue of fact existed due

In *Jones* and *Emery*, the courts relied upon persuasive case law from other circuits recognizing that generally, an absolute ban on inmate access to newspapers and magazines violates the First Amendment because it is considered an exaggerated response to legitimate penological needs. *See Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986). Nevertheless, certain restrictions on access to newspapers and magazines have been recognized as valid. *See Beard v. Banks*, 548 U.S. 521, 530 (2006) (prison's policy of restricting access to newspapers, magazines, and photographs to inmates placed in most restrictive level of prison's long-term segregation unit was justified by the need to provide particularly difficult prisoners with increased incentives for better prison behavior, the need to minimize the amount of property they control in their cells, and the need to ensure prison safety).

Defendants focus their arguments on distinguishing the MCDC's policy from those previously found unconstitutional. In *Mann,* the Fifth Circuit found the complete newspaper ban to be an exaggerated response to achieve the stated objective of preventing fires and clogged toilets. 796 F.2d at 82. The *Mann* court specifically recognized the underinclusive nature of the ban – i.e., allowing other papers and materials that can be used for starting fires and clogging plumbing while banning newspapers "strongly suggests that it is indeed an exaggerated response." *Id.* Similarly, the Tenth Circuit in *Thomas v. Leslie* held that an absolute ban on newspapers did not constitute a valid, rational connection between the prison regulation and the interest used to

---

to conflicting information on the summary judgment record regarding whether an absolute ban on newspapers exists at the MCDC), and *Choate v. Runion,* Civil No. 4:20-cv-04109-BAB, 2022 WL 3908836 (W.D. Ark. Aug. 30, 2022) (joint motion to dismiss pending after settlement of the plaintiff's first amendment claim which survived summary judgment because the Honorable Barry A. Bryant found genuine issues of material fact existed as to whether there was a complete ban on newspapers at the MCDC). The Court finds *Morris* and *Choate* uninstructive here. Unlike the *Morris* and *Choate* defendants, Defendants here have presented summary judgment evidence as to the MCDC policy, who enacted it, and what legitimate penological interest it proposes to address.

justify it because the hazards posed by newspapers could be caused by the permitted reading materials allowed to inmates.  Civil No. 97-3361, 1999 WL 281416, at *8 (10th Cir. 1999).  This is the same reasoning applied by this district in *Emery* and *Jones.*

In *Jones*, there was no summary judgment evidence concerning the frequency of the proposed hazards – fires and clogged plumbing – before or after the ban on newspapers was instituted.  The *Jones* court observed this void in the record while also noting the availability of similar materials were available, finding an issue of fact remained as to whether the ban was rationally related to the proposed penological interest.  *Jones,* 2007 WL 2725218, at *7-8 (finding genuine issue of material fact existed as to whether defendants' ban of newspapers and magazines was rationally related to the stated legitimate penological interest – prevention of fires and toilet clogging – when inmates had access to similar materials that could cause the same problems such as bibles, books, towels, letters, envelopes, stamps, clothing, paper, sheets, blankets, and other materials).

Similarly, in *Emery*, the court found defendants failed to submit any supporting evidence concerning the frequency of fires or clogged plumping before or after the newspaper ban was put into place.  *Emery,* 2018 WL 715463, *17 (finding genuine issue of material fact existed as to whether the ban of newspapers was rationally related to the stated legitimate penological interest— preventing fires and plumbing clogs—because the inmates were allowed similar materials that could cause the same problems such as books, letters, envelopes, and other materials).  As in *Jones,* the court found a genuine issue of material fact remained as to whether the policy was rationally related to furthering the proposed penological interest.  *Id.*

Defendants argue the instant MCDC policy is distinguishable from the policies considered in *Mann* and *Thomas*.  The Court agrees, finding the instant summary judgment record

14

distinguishable from the records presented in *Jones* and *Emery*.   Defendants have produced a record on summary judgment evidencing the unique qualities of newspapers observed by MCDC jail administration in causing the hazards of covered lights, jammed door locks, and clogged toilets. More convincingly, Defendants have presented sworn testimony that the ban on newspapers, even while still allowing other publications, has "significantly reduced" the occurrences of the stated hazards.  (ECF No. 20-7).  Plaintiff has not disputed the unique nature of newspapers, or the stated reduction accomplished by the ban.  Thus, there is no factual dispute on the instant record as to the rational relationship between the newspaper ban and the MCDC's legitimate penological interest. Giving "substantial deference to the professional judgment" of the MCDC administrators in identifying substantial causes of hazards within the MCDC, *Overton v. Bazetta,* 539 U.S. 126, 132 (2003), and without contrary evidence in the summary judgment record, the Court finds an undisputed rational relationship between MCDC's newspaper ban and its legitimate penological interest in lessening the occurrences of light coverings, door jamming, and toilet clogging which is both established and unexaggerated.

### 2.   Are there alternative means for Plaintiff to access news and information?

Having survived the threshold issue, the court must now weigh the remaining *Turner* factors.  *See Sisney*, 15 F.4th at1190.  The second *Turner* factor to be considered is whether there are alternative means for Plaintiff to exercise his First Amendment rights.  While alternative means of asserting this right do not need to be "ideal," they do need to be "available."  *See Human Rights Defense Ctr.*, 999 F.3d at 1165.  "If the alternative means are illusory, impractical, or otherwise unavailable, this would weigh in favor of [the plaintiff] under the second *Turner* factor." *Id.*

Relying on *Thornburgh v. Abbott,* Defendants argue because they allow other types of mail and publications – magazines, books, post cards and letters – to be received at the MCDC, they

are providing an adequate alternative means for Plaintiff to exercise his First Amendment rights. In *Thornburgh*, the Supreme Court held that a policy allowing the prison warden to ban specific publications because they disrupted the security and safety of the prison was reasonable under *Turner*. The reasonableness was based upon the adequate available and alternative means of expression that remained open to the *Thornburgh* inmates through a broad range of other publications. 490 U.S. 401, 402 (1989). Notably, and importantly, the policy at issue in *Thornburgh* did not completely ban any one type of publication, such as newspapers, and Thornburgh can be distinguished as a result. *Id.*

The Court is unconvinced that the types of mail described by Defendants provide Plaintiff with an available alternative means to receive the news. There is nothing on the summary judgment record to indicate the alternatives listed by Defendants contain daily news and/or information in the same or similar way that a newspaper provides news. Defendants themselves argue, under the first *Turner* factor analysis, that newspapers are unique in their content and differ from books and magazines. (ECF No. 19, p. 8). Accordingly, the Court finds there is a genuine issue of material fact as to whether these alternative sources are adequate alternatives to a newspaper subscription. *See Scharnhorst v. Cantrell, et al.,* Civil No. 5:22-cv-05138-TLB (W.D. Ark. Dec. 12, 2023) (finding evidence of sporadic access to online newspaper publication on jail's kiosk system created a genuine issue of material fact as to whether an adequate alternative existed under *Turner*).

Defendants particularly argue Plaintiff is provided an adequate alternative through television access with three local news channels. However, Plaintiff states in his November 7, 2022, grievance that he does not and cannot control the television at the MCDC and has not been able to watch any news while incarcerated in the MCDC. (ECF No. 20-3). Defendant Walker

states in his affidavit that the detainees get to vote on what channels to watch on the television. (ECF No. 20-7, p. 4). The record before the Court does not indicate whether news is ever broadcast on the MCDC televisions or how often Plaintiff has access to watch a television. Accordingly, there is a genuine issue of material fact as to whether Plaintiff has access to alternative means of exercising his First Amendment rights.

Furthermore, even if the record was clear as to Plaintiff's access to the television, this may not be an adequate substitution for access to newspaper publications. *See Jones*, 2007 WL 2725218, *8 (W.D. Ark. Sept. 18, 2007) (citing *Jacklovich v. Simmons*, 392 F.3d 420, 431 (10th Cir. 2004) ("Concerning the inmates' other alternative means to exercise their First Amendment rights, we agree that the ability to listen to the radio or watch television is not an adequate substitute for reading newspapers and magazines)); *see also Mann*, 796 F.2d at 83. As the Court has determined that genuine issues of material fact exist as to the second *Turner* factor, the Court cannot adequately weigh the totality of the *Turner* factors as they apply to the MCDC's policy completely banning newspapers. *See Human Rights Defense Center v. Baxter Cnty., Arkansas*, 360 F.Supp.3d 870, 877 (W.D. Ark. 2019) (denying summary judgment because analysis of the *Turner* factors depends upon factual disputes which are inappropriate for the court to resolve on summary judgment). Thus, the Court need not address the last two *Turner* factors at this time.

### B. Individual and official capacity claims

Defendants argue Plaintiff has failed to state individual capacity claims against any defendant, and that there is no basis for any official capacity claims against any defendant since no constitutional violation occurred.

"Public servants may be sued under section 1983 in either their official capacity, their individual capacity, or both." *Johnson v. Outboard Marine Corp.,* 172 F.3d 531, 535 (8th Cir.

1999) (citing *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997)).  Here, Plaintiff has named each defendant in both that person's individual and official capacity.  The Court will address each in turn.

### 1.  Official capacity claims

Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  Here, the Court treats Plaintiff's official capacity claims as ones against Miller County itself.  A governmental entity such as Miller County is liable "under § 1983 only when the entity itself is 'the moving force' behind the deprivation." *Id.* at 166.  In an official-capacity suit, therefore, "the entity's 'policy or custom' must have played a part in the violation of federal law." *Id.* (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1974)).

Plaintiff alleges in his Complaint that:

> Miller County Detention Center has a policy, enacted by [it's] officials (Defendants listed) which bans its inmate population from receiving [n]ewspapers or publications.  This [p]olicy is enforced without any penological or just explanation; this policy, plain and simple, is unconstitutional.

(ECF No. 1, p. 5).

 Defendant's Mail Policy states in pertinent part:

> Publications will be disapproved if the material … are newspapers.

(ECF No. 20-6, p. 5).  Defendants concede the MCDC has a policy of banning the delivery of all newspapers to detainees.  (ECF No. 20-7, p. 2).

"When a plaintiff can point to a municipal policy that either 'violates federal law, or directs an employee to do so,' 'no evidence is needed other than a statement of the municipal policy and its exercise' to establish a constitutional violation." *Brewington v. Keener*, 902 F.3d 796, 801 (8th

Cir. 2018) (citing *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389-90 (8th Cir. 2007) (additional citations omitted)).   Plaintiff clearly stated an official capacity claim against the Defendants here, and as described above, there is a material factual dispute about whether the MCDC's newspaper policy is reasonable under the First Amendment.   Accordingly, the Court recommends that Plaintiff's official capacity claims survive summary judgment.

### 2.  Individual capacity claims

The Court now turns to Plaintiff's individual capacity claims and Defendants' assertion of qualified immunity.  "Suits against officials in their individual capacity seek to impose personal liability upon a government official for actions he takes under color of state law." *Handt v. Lynch*, 681 F.3d 939, 943 (8th Cir. 2012) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).  To establish liability against officials in their individual capacity, "the plaintiff must show that the official, acting under color of state law caused the deprivation of a federal right." *Id.* at 943 (citing *Graham*, 473 U.S. at 166); *see also Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) ("Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.").

Even so, such "[i]ndividual defendants are entitled to qualified immunity unless their alleged conduct violated 'clearly established statutory or constitutional rights of which a reasonable person [in his position] would have known." *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  At summary judgment, "the burden remains on the proponent of the immunity to establish the relevant predicate facts, and at the summary judgment stage the nonmoving party is given the benefit of all reasonable inferences." *Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir. 2000).  "In the event that a genuine dispute exists concerning predicate facts material to the qualified immunity issue, the

defendant is not entitled to summary judgment on that ground." *Id.* (internal citation omitted). But "once the predicate facts have been established, for the purposes of qualified immunity . . . the conduct was either 'reasonable under settled law in the circumstances [ ] or it was not . . . and this is a determination of law that should be made at the earliest possible stage in litigation." *Id.* (internal citations and quotations omitted).

In his Complaint, Plaintiff complains of the denial of his subscription to the Texarkana Gazette newspaper by "Miller County Detention Center" because of the MCDC policy that forbids inmates from receiving newspapers. Plaintiff states his belief that "either Sheriff Jackie Runion, Warden Jeffie Walker, or Captain Adams" are responsible for "creating and enacting," said policy. (ECF No. 1, p. 5). Plaintiff's only allegation against Defendant Landreth is that he inadequately responded to Plaintiff's grievances. Plaintiff does not make any allegations against Defendant Landreth regarding the newspaper ban policy itself.

### a. Defendants Runion and Walker

As noted, Plaintiff alleges that Defendants Runion and Walker were responsible for "creating and enacting" the MCDC policy which banned newspapers. (ECF No. 1, p. 5).

Defendant Walker's Affidavit avers that he is the Warden of the MCDC, and he administers "the various operations of the [MCDC] pursuant to the policies and procedures implemented by [Defendant Runion]." (ECF No. 20-7, p. 2). Walker stated that he and Defendant Runion "decided together to enact a policy to ban non-religious newspapers within the [MCDC] . . .." (ECF No. 20-7, p. 2). Defendant Walker also described that assistants within the jail handle incoming mail and Defendants were not themselves personally involved in preventing Plaintiff from receiving his newspaper subscription. (ECF No. 20-7, p. 4).

Viewing the summary judgment record in the light most favorable to the Plaintiff, the Court believes a factfinder could conclude Defendants Runion and Walker were directly involved in creating, enacting, and overseeing the newspaper policy at issue. *See Elder v. Gillespie*, 54 F.4th 1055, 1065 (8th Cir. 2022) (plaintiff alleged sufficient facts that defendants were involved in "creating, applying, or interpreting" policy to survive motion to dismiss); *see also Jackson v. Nixon*, 747 F.3d 537, 545 (8th Cir. 2014) (explaining that personal liability under § 1983 can be established by showing that the defendant was "directly involved in making, implementing or enforcing a policy decision that 'created unconstitutional conditions.'") (quoting *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985)).

The question thus becomes whether Defendants Runion and Walker are entitled to qualified immunity for their actions. As described in detail above, material factual disputes preclude this Court from determining (at this summary judgment stage) whether the MCDC's policy banning newspapers is unreasonable under *Turner*. Because these predicate facts have not been established, Defendants Runion and Walker are not entitled to qualified immunity at this stage of the litigation. *See Pace,* 201 F.3d at 1056.

The Court notes, however, that even if the MCDC policy on newspapers is ultimately determined unconstitutional, Defendants Runion and Walker are nevertheless entitled to qualified immunity unless Plaintiff's constitutional right was clearly established at the time of the deprivation. *Howard v. Kansas City Police Dept.*, 570 F.3d 984, 988 (8th Cir. 2009). Under this prong of the analysis, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 991 (internal citation omitted).

For purposes of this summary judgment analysis and given the established law during the timeframe in question (July 2021 through December 2022), the Court believes a reasonable officer

would recognize that the MCDC's policy completely banning newspapers was unconstitutional. "The Supreme Court has twice warned that 'a de facto permanent ban' on inmate access to communications with outsiders would present a serious constitutional issue." *Human Rights Defense Center v. Baxter Cnty. Ark.*, 999 F.3d 1160, 1165 (8th Cir. 2021) (citing *Beard v. Banks*, 548 U.S. 521, 535 (2006) and *Overton v. Bazzetta*, 539 U.S. 126, 134 (2003)). Additionally, other Circuits have critiqued very similar bans on newspapers. *See e. g., Thomas v. Leslie,* 176 F.3d 489, 7 (10th Cir. 1999); *Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986). Furthermore, many courts have held that prisoners have a right to receive and read newspapers. *See, e.g., Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir. 1987) (absent restrictions based on legitimate goals of confinement, prison inmates retain First Amendment right to receive and read newspapers); *Wilkinson v. Skinner*, 462 F.2d 670, 673, n. 5 (2nd Cir. 1972) ("refusal to deliver a newspaper would ordinarily be interference with appellant's first amendment rights"); *Rowland v. Jones*, 452 F.2d 1005, 1006 (8th Cir. 1971) (prison authorities' denial of access to newspaper "Muhammad Speaks" constituted prior restraint in violation of First Amendment); *Spellman v. Hopper*, 95 F.Supp.2d 1267 (M.D. Ala. 1999) (absolute prohibition on subscription magazines and newspapers applied to administrative segregation inmates in Alabama is not reasonably related to legitimate penological goals). It has even been held that "[t]here is no basis for total restrictions on prisoners' access to the news in view of their clear First Amendment rights." *United States ex rel. Manicone v. Corso,* 365 F.Supp.576, 577 (E.D.N.Y. 1973).

When viewed in the light most favorable to Plaintiff, the summary judgment record supports that MCDC's policy of banning newspapers operates as a de facto ban on inmates' access to daily news. Accordingly, the Court recommends that Defendants Runion and Walker be denied

qualified immunity at this time, and that Defendants' Motion for Summary Judgment be denied as to Defendants Runion and Walker.

b.    **Defendant Adams**

Plaintiff makes the same allegations against Defendant Adams in his Complaint as he made against Defendants Runion and Walker – that Adams enacted the ban on newspapers and thus prevented Plaintiff from receiving his newspaper subscription.  However, as explained above, Defendant Walker testified in his affidavit that it was not he but Defendants Runion and Walker that enacted the MCDC's ban on newspapers.  (ECF Nos. 26, 27).  In this respect, the MCDC's mail policy provides as follows under the section on Publications:

> The **Captain** will disapprove a publication if it is deemed an immediate and/or tangible threat to the security or good order of the jail or staff.  This includes but is not limited to content of publications used to introduce contraband.

(ECF No. 20-6, p. 4) (emphasis added).  Defendant Adams was the Captain of the MCDC during the time relevant to Plaintiff's claims.  (ECF No. 1, p. 2).  While Defendant Walker contends Defendant Adams did not enact the ban on newspapers, the stated Policy indicates it is the Captain's responsibility to disapprove publications for detainees.  These conflicting facts on the record, when viewed in the light most favorable to the Plaintiff, create a genuine issue of fact as to whether Defendant Adams had a personal role in denying Plaintiff's access to his newspaper subscription.  Additionally, and for the same reasoning applied to Defendants Runion and Walker, Defendant Adams is not entitled to qualified immunity at this stage.  *See supra*, pp. 20-22.

Accordingly, the Court recommends that Defendants' Motion for Summary Judgment with respect to Plaintiff's claim against Defendant Adams also be denied.

### c. Defendant Landreth

The only factual assertions against Defendant Landreth in Plaintiff's Complaint relate to Defendant Landreth's responses to Plaintiff's grievances.  Defendants argue this does not create any liability for Defendant Landreth, and the Court agrees.  "A prison grievance procedure is a procedural right only; it does not confer any substantive right upon the inmates."  *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (per curiam) (internal quotation omitted).  Accordingly, to the extent Plaintiff claims that Defendant Landreth violated his constitutional rights by inadequately responding to Plaintiff's grievances, this Court agrees that such a claim is not, by itself, sufficient to establish a constitutional violation as a matter of law.  *See Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (per curiam).

Furthermore, even when the Court gives Plaintiff's Complaint a liberal construction[4] and interprets an assertion of a supervisor liability claim against Defendant Landreth as the Administrator of the MCDC, Plaintiff's claims against Defendant Landreth still fail.  As a supervisor, Defendant Landreth may be held individually liable under Section 1983 only if he directly participated in a constitutional violation or if his failure to properly supervise and train the offending employee[s] caused the deprivation of constitutional rights.  *See Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997).  Direct action "may be found if the supervisor is 'involved in creating, applying, or interpreting a policy that gives rise to unconstitutional conditions."  *Parada v. Anoka Cnty.*, 481 F.Supp.3d 888, 904 (D. Minn. 2020).  Under the "failure to train or supervise" theory, the supervisor is "entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was

---

[4] *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam) (pro se litigant's allegations are to be liberally construed)

deliberately indifferent to or authorized those acts." *Davis v. Buchanan Cnty., Missouri*, 11 F.4th 604, 624 (8th Cir. 2021) (quoting *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015)).

There are no facts – disputed or otherwise – in the record which illustrate Defendant Landreth played any role in creating, enacting, and overseeing the MCDC's ban on newspapers or suggest that his failure to supervise caused the alleged constitutional violations. Accordingly, the Court recommends that Plaintiff's claim against Defendant Landreth in his individual capacity be dismissed.

Finally, since the Court recommends dismissal of Plaintiff's individual claims against Defendant Landreth in his individual capacity, this Court similarly recommends dismissing the official capacity claims against Defendant Landreth on the grounds that official capacity claim is duplicative of the official capacity claims against Defendants Runion, Walker, and Adams that are recommended to survive summary judgment. *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (official capacity claims are "functionally equivalent to a suit against the employing governmental entity").[5] Accordingly, the Court recommends Defendant Landreth be dismissed from this matter.

## V.  CONCLUSION

For the reasons stated above, the undersigned recommends that Defendants' Motion for Summary Judgment (ECF No. 18) be **GRANTED in part and DENIED in part, as follows: (**1) All claims against Defendant Landreth be **DISMISSED WITH PREJUDICE;** and (2) all claims

---

[5] Defendants make arguments regarding what type of damages Plaintiff may recover if he is successful in his claims. The Court finds this argument premature at this stage; it remains an issue for trial.

against Defendants Runion, Walker, and Adams, in their official and individual capacities, remain for further litigation.

The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 12th day of January 2024.

Status of Referral: Terminated

*Christy Comstock*

CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE